**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WAYNE C. CONLEE,<br><br>      Plaintiff,<br><br>      v.<br><br>WMS INDUSTRIES, INC., BRIAN R. GAMACHE, SCOTT D. SCHWEINFURTH, and ORRIN J. EDIDIN,<br><br>      Defendants. | | No. 11 C 3503<br>Judge James B. Zagel |
| | | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Kenneth Zeitlin ("Zeitlin" or "Lead Plaintiff") is the lead plaintiff in a securities fraud class action brought against Defendants WMS Industries, Inc. ("WMS"), WMS Chief Executive Officer and Chairman Brian R. Gamache, WMS Chief Financial Officer Scott D. Schweinfurth, and President Orrin J. Edidin. The amended complaint has two substantive counts. Count I alleges violations of § 10b of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Count II alleges control person liability for the individual Defendants under § 20(a) of the Securities Exchange Act.

I determine that the pleading is an impermissible "puzzle pleading" and therefore grant Defendants' motion to dismiss. Because the dismissal is due to the form of the pleading, rather than its substance, the dismissal is without prejudice to Lead Plaintiff filing an additional amended complaint.

1

**GENERAL BACKGROUND**

The facts, as alleged by Lead Plaintiff, are as follows.

WMS manufactures and distributes video and gaming machines, such as electronic slot machines, to casinos worldwide. WMS earns revenue through sales and leases of those machines. According to the Amended Complaint, at the start of the Class Period, the gaming industry was still in the midst of a slow replacement cycle. The replacement cycle is the process by which casinos swap out old gaming machines for new ones to refresh and modernize the gaming floors. The clear implication is that a faster replacement cycle essentially equates to greater demand for WMS's products, all other factors being equal.

Despite the comparatively slow replacement cycle, Defendants issued guidance showing robust growth in earnings and margins in FY11 over FY10. The forecasts, respectively, were $830-$850 million in revenues compared to $765 million and operating margins of 22.5-23% compared to 21.9%). Analysts were skeptical because the market was not expecting improvement in the replacement cycle in FY11. Despite this skepticism, Defendants assured investors that WMS would improve its financial performance over FY10 despite the slow replacement cycle. Defendants did so on the basis that they had two principal "levers" available to them to drive revenues and margins in FY11 above FY10.

The first lever Defendants touted was the launch of new products in FY11. One such product was "WAGENET," a purported "golden goose" that would be available for "full commercial launch" in second quarter of FY11 ("2Q11"). Defendants also touted the imminent launch of other theme-based gaming machines such as "The Price is Right" and "Attack from Mars." Defendants claimed to have "accelerated" the new product launches, with Defendant

2

Gamache highlighting the quantity and scale of FY11 new product launches. Gamache allegedly told investors during a January 25, 2011 conference call that WMS "never had a back half of the year loaded with this kind of product launch, ever in the history of our company." Defendants further assured investors that WMS was "on track" to meet their lofty guidance due in part to the fact that they would be "having literally a theme every month in the back half of the year come out."

Defendants claimed that the FY11 new products were "higher-margin" products, defendants' margin guidance showed considerable improvement, for example, margins of approximately 29% in 4Q11, much higher than FY10 (21.9%) and the first half of FY11 (17%), as a result of the favorable mix of the FY11 new, high margin products on total sales.

Defendants' statements are alleged to be false and misleading because WMS was experiencing development and process failures that were delaying regulatory submissions and commercialization of its FY11 new products. The new products that Defendants claimed would be launched in FY11 were more technologically complex to develop and, since the technology linked across products, these complexities caused development delays across multiple products. For example, the "Price is Right" game allegedly suffered from a programming error which miscalculated its incremental rate and required multiple fixes. Additionally, the "Attack from Mars" game failed in field trials (an important step in regulatory approval) because players were not winning. The touted "golden goose," WAGE-NET, had its initial regulatory approval delayed from October 2010 to April 2011, and even then only very limited approval was obtained.

The end result of the delays was that Defendants did not reach the final stage of

regulatory approval, field trials, in critical jurisdictions like Nevada until 4Q11. This allegedly derailed the full commercial launch of new products. Rather than launching the most products "ever in the history of the company," defendants launched fewer new products in FY11 than in FY10, and only one of their usual four annual "tent pole" new products.

The amended complaint alleges that Defendants knew or recklessly disregarded facts that the FY11 new products were not on track to launch in sufficient time and quantity to drive FY11 revenues and margins in the manner they had forecast. Lead Plaintiff claims that Defendants closely monitored new products throughout the research and development process ("R&D") process, up to and including commercial launch.

These purported product and process failures left WMS with little to sell other than apparently low margin used gaming machines. Therefore, rather than increase, forecasted 29% guidance, margins came in at a "disappointing" 4.7% in 4Q11. Additionally, though WMS had slightly higher total sales in FY11, sales fell far short of the $830-$850 million FY11 guidance. Moreover, the higher sales came with lower profitability as margins dropped to 14.1% from 21.9%.

The second "lever" used to justify improved performance was an operational improvement to fix a phenomenon called "quarter-end compression." WMS routinely discounted product at the end of quarters to boost sales, which led to a bulk of orders coming in at the ends of quarters. This both increased costs of production, for example extra overtime and shipping costs, and created difficulties sourcing product to fill orders on time. Defendants touted their "vigilance" and "intense focus" implementing these operational improvements to combat the inefficiencies of quarter-end compression. The goal of the process improvements was to

achieve better monitoring of new product introductions and be able to replenish inventory "within two hours." However, allegedly unbeknownst to investors, Defendants had not undertaken the touted operational improvements. This was allegedly revealed when the Company disclosed that it failed to fill orders on time in 3Q11 because they could not timely source important machine components. Following up on that supposed failure, Defendants promised to undertake a host of operational improvements directed at cleaning up quarter-end compression of the sort that they had supposedly already been undertaking.

According to the Amended Complaint, toward the end of the Class Period, WMS announced the shortfall in earnings and margins, refused to provide more guidance, and admitted few new products were launched in FY11. In addition, contrary to defendants' statements at the beginning of the Class Period that FY11 guidance was not dependent on improvement in the replacement cycle, Defendants – in Lead Plaintiff's view – "admitted" at the end of the Class Period that their guidance had been dependent on such improvement and they had to lower guidance when that improvement did not materialize. The Company's stock price dropped from $36 immediately before the initial disclosure on April 11 to $18 after the final disclosure on August 4 on very heavy trading volume.

**STANDARD OF REVIEW**

When considering a Rule 12(b)(6) motion in securities fraud actions, district courts must, "as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("*Tellabs II*"). Courts are to consider the complaint in its entirety and not simply scrutinize each allegation in insolation. *Id*.

Beyond these basic considerations, § 10(b) claims sound in fraud, and the rules require particularized pleading in fraud cases: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Rule 9 "requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merchant Servs.,* Inc., 20 F.3d 771, 777 (7th Cir. 1994) (internal quotation omitted).

On top of the special burden imposed by the Rules, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") to combat perceived abuses in private securities fraud actions. *Tellabs II*, 551 U.S. at 313-14 (2007). One key component of the PSLRA was to further heighten pleading standards beyond Rule 9 for securities fraud suits.  *Id.*  In charging misrepresentations or omissions of material fact, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, in pleading scienter, the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  A strong inference of the required state of mind means "it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs II*, 551 U.S. at 314 (2007).

**ANALYSIS**

6

The Amended Complaint levels two causes of action against Defendants. Count I asserts violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the SEC's Rule 10(b)(5), 17 C.F.R. 240.10b-5. "Section 10(b) . . . forbids the 'use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Tellabs II*, 551 U.S. at 318 (quoting 15 U.S.C. § 78j(b)). Rule 10b-5 forbids a company or an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs III*"), 513 F.3d 702, 704 (7th Cir. 2008) (quoting 17 C.F.R. § 240.10b-5(b)).

In a § 10(b) private action, a plaintiff must successfully plead and ultimately prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Pugh v. Tribune Co.,* 521 F.3d 686, 693 (7th Cir. 2008) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008)).

Count II of the Complaint alleges violations of § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). That provision provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." *Id.* To state a claim under § 20(a), then, Lead Plaintiff must first

7

adequately plead a primary violation of securities laws--here, a violation of § 10(b) and Rule 10b-5. *Pugh*, 521 F.3d at 693.

Defendants' first argument for dismissal is that the Amended Complaint is an inadequate "puzzle pleading." *See e.g., In re Harley Davidson*, 660 F. Supp. 2d 969, 983-984 (E.D. Wis. 2009); *In re Guidant Corp. Sec. Litig.,* 536 F. Supp. 2d 913, 926 (S.D. Ind. 2008). A puzzle pleading, courts have stated, "improperly 'place[s] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts. This method is deficient under the pleading standards.'" *In re Harley Davidson* 660 F. Supp. 2d at 984 (quoting *In re Alcatel Sec. Litig.,* 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005)). A complaint which relies on puzzle pleading does not meet Rule 9(b)'s particularity requirement. *Teamsters Local 617 Pension & Funds v. Apollo Group*, 633 F. Supp. 2d 763, 783 (D. Ariz. 2009).

The complaint here is an inappropriate puzzle pleading. At fifty-three pages and 126 paragraphs, the Amended Complaint is not especially long in the context of securities fraud cases. Nevertheless, the heart of the complaint, the section titled "Defendants' False and Misleading Statements Made During the Class Period," is a sixteen page mash-up of block quotes, snippets, parentheticals, and Lead Plaintiff's characterizations of alleged statements made by one or more Defendants. Rather than simply lay out a given statement and then list the reasons it is false or misleading (as the PSLRA commands) Lead Plaintiff has laid the statements out in three chronological bunches (the statements made on September 21, 2010, those made on November 1, 2010, and those made on January 25, 2011). While in another context a simple chronological ordering might be appropriate, here the resulting pleading is less useful. This is because the statements, though contemporaneous, pertain to disparate subject matter. The net

8

effect of the pleading's format is to leave the reader – whether Defendants or the court – jumping from page to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading.  Even this activity might be tolerable if the statements themselves were clearly identified, but as noted above, they are not.  Rather, it is frequently difficult to discern where the supposedly challenged statements end and the context or characterization begins.

   The act of piecing together a disjointed complaint is certainly a nuisance, but if the court's and the parties' time and effort in interpreting a pleading were the only cost it might not necessarily require dismissal. The greater cost of inappropriate puzzle pleading comes in discovery.  A vague and ill-formed complaint can lead to more expansive (and expensive) document production and unnecessarily lengthy depositions covering needless factual ground.  For this reason, where a complaint contains puzzle pleading, courts have recommended that Plaintiff should be required to "streamline and reorganize the complaint before allowing it to serve as the document controlling discovery."[1] *In re Metro. Sec. Litig.,* 532 F. Supp. 2d 1260, 1280 (E.D. Wash. 2007) (quoting *Decker v. Glenfed, Inc.*, 42 F.3d 1541, 1554 (9th Cir. 1994)).  For this reason, Lead Plaintiff is given one additional opportunity to makes his allegations with particularity.

---

[1] In the context of this particular complaint, the focus should be on reorganization and less on "streamlining."  As I mentioned above, the current pleading is not particularly long as compared to other PSLRA complaints, but it is disjointed as to the factual ground it covers and the statements it identifies.  The amended complaint (if any) may be shorter, but it may even be longer.  The key point for this case is to present the allegations in an easier-to-follow format.

**CONCLUSION**

       Defendant's motion to dismiss the amended complaint [38] is GRANTED.  The

dismissal is WITHOUT PREJUDICE.  Lead Plaintiff is given 45 days from the entry of this

motion to file an amended pleading, if he wishes to do so.

                              ENTER:

                              *James B. Zagel*

                              James B. Zagel

                              United States District Judge

DATE: July 25, 2012