**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WAYNE C. CONLEE,<br><br>　　　　Plaintiff,<br><br>　　　v.<br><br>WMS INDUSTRIES, INC., BRIAN R. GAMACHE, SCOTT D. SCHWEINFURTH, and ORRIN J. EDIDIN,<br><br>　　　　Defendants. | No. 11 C 3503<br>Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

Wayne Conlee ("Plaintiff") is the lead plaintiff in a securities fraud class action brought against Defendants WMS Industries, Inc. ("WMS"), WMS Chief Executive Officer and Chairman Brian R. Gamache, WMS Chief Financial Officer Scott D. Schweinfurth, and President Orrin J. Edidin. The Second Amended Complaint has two substantive counts. Count I alleges violations of § 10b of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Count II alleges control person liability for the Individual Defendants under § 20(a) of the Securities Exchange Act.

In an Order dated July 25, 2012, I granted Defendants' motion to dismiss Plaintiff's Amended Complaint without prejudice as an impermissible puzzle pleading. *Conlee v. WMS Industries, Inc., et al.*, 2012 WL 3042498. Presently before the Court is Defendant's motion to dismiss Plaintiff's Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b). Although I am satisfied that the problems with the form of the pleading in the previous complaint

have been addressed, for the following reasons, Defendants' motion is granted, this time with prejudice.

## BACKGROUND

The facts, as alleged by Plaintiff and taken in part from my Order of July 25, are as follows.

WMS manufactures and distributes video and gaming machines, such as electronic slot machines, to casinos worldwide. WMS earns revenue through sales and leases of those machines. According to the Complaint, at the start of the Class Period, the gaming industry was still in the midst of a slow replacement cycle. The replacement cycle is the process by which casinos swap out old gaming machines for new ones to refresh and modernize the gaming floors. The clear implication is that a faster replacement cycle essentially equates to greater demand for WMS's products, all other factors being equal.

Despite the comparatively slow replacement cycle, Defendants issued guidance showing robust growth in earnings and margins in FY11 over FY10. The forecasts, respectively, were $830-$850 million in revenues compared to $765 million in FY10, and operating margins of 22.5-23% compared to 21.9% in FY10. Analysts were skeptical because the market was not expecting improvement in the replacement cycle in FY11. Despite this skepticism, Defendants assured investors that WMS would improve its financial performance over FY10 despite the slow replacement cycle. Defendants did so on the basis that they had two principal "levers" available to them to drive revenues and margins in FY11 above FY10.

The first lever Defendants touted was the launch of new products in FY11. One such product was "WAGE-NET," a purported "golden goose." In September 2010, Defendants announced that WAGE-NET would be available for "full commercial launch" in December

2011. Defendants also touted the imminent launch of other theme-based gaming machines such as "The Price is Right" and "Attack from Mars." Defendants claimed to have "accelerated" the new product launches, with Mr. Gamache highlighting the quantity and scale of FY11 new product launches. Mr. Gamache allegedly told investors during a January 25, 2011 conference call that WMS "never had a back half of the year loaded with this kind of product launch, ever in the history of our company." Defendants further assured investors that WMS was "on track" to meet their lofty guidance due in part to the fact that they would be "having literally a theme every month in the back half of the year come out."

Defendants claimed that the FY11 new products were "higher-margin" products, and Defendants' margin guidance showed considerable improvement. For example, Defendants' guidance showed margins of approximately 29% in 4Q11 (much higher than the 21.9% margin in FY10 and the 17% margin in the first half of FY11) as a result of the favorable impact of the new FY11 high margin products on total sales.

Defendants' statements are alleged to be false and misleading because WMS was experiencing development and process failures that were delaying regulatory submissions and commercialization of its FY11 new products. The touted "golden goose," WAGE-NET, had its initial regulatory approval delayed from October 2010 to April 2011, and even then only very limited approval was obtained. Required field trials in critical jurisdictions like Nevada had not yet begun. The new products that Defendants claimed would be launched in FY11 proved more technologically complex to develop, and, since the technology linked across products, these complexities cause development delays across multiple products.

Ultimately, WAGE-NET did not launch as predicted, and rather than launching the most products "ever in the history of the company," Defendants launched fewer new products in FY11

than in FY10.  The Complaint alleges that Defendants knew or recklessly disregarded facts making clear that the FY11 new products were not on track to launch in sufficient time and quantity to drive FY11 revenues and margins in the manner they had forecast.  These purported product and process failures left WMS with little to sell other than apparently low margin used gaming machines.  Therefore, rather than increase, forecasted 29% guidance margins came in at a "disappointing" 4.7% in 4Q11. Additionally, though WMS had slightly higher total sales in FY11, sales fell far short of the $830-$850 million FY11 guidance.  Moreover, the higher sales came with lower profitability as margins dropped to 14.1% from 21.9%.

      The second "lever" used to justify improved performance was an operational improvement to fix a phenomenon called "quarter-end compression."  WMS routinely discounted product at the end of quarters to boost sales, which led to a bulk of orders coming in at the ends of quarters.  This both increased costs of production, for example extra overtime and shipping costs, and created difficulties sourcing product to fill orders on time.  Defendants touted their "vigilance" and "intense focus" implementing these operational improvements to combat the inefficiencies of quarter-end compression.  The goal of the process improvements was to achieve better monitoring of new product introductions and be able to replenish inventory "within two hours."

      It appears, however, that Defendants did not undertake the touted operational improvements, or at least not initially.  As Plaintiff has it, this was revealed when the Company disclosed that it failed to fill orders on time in 3Q11 because they could not timely source important machine components.  Following up on that supposed failure, Defendants promised to undertake a host of operational improvements directed at cleaning up quarter-end compression of the sort that they had supposedly already been undertaking.

4

According to the Amended Complaint, toward the end of the Class Period, WMS announced the shortfall in earnings and margins, refused to provide more guidance, and admitted few new products were launched in FY11. In addition, contrary to defendants' statements at the beginning of the Class Period that FY11 guidance was not dependent on improvement in the replacement cycle, Defendants – in Lead Plaintiff's view – "admitted" at the end of the Class Period that their guidance had been dependent on such improvement and they had to lower guidance when that improvement did not materialize. The Company's stock price dropped from $36 immediately before the initial disclosure on April 11 to $18 after the final disclosure on August 4 on very heavy trading volume.

## DISCUSSION

### A. Legal Standards

A complaint in a securities fraud action must not only "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009), but must also meet the "exacting pleading requirements" of the Private Securities Litigation Reform Act (PSLRA).[1] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("*Tellabs II*"). The PSLRA requires plaintiffs to: (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"; and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78(u)–4(b)(2).

The "required state of mind" in a § 10(b) case is scienter, which is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk

---

[1]Securities fraud claims must also meet Federal Rule 9(b)'s heightened pleading standard but this is effectively subsumed by the PSLRA, which requires plaintiffs to plead with particularity as to circumstances *and* state of mind.

that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). Facts giving rise to an inference that the defendant acted with scienter must be stated with particularity. Vagueness, imprecision and ambiguities on this score thus "count against" the inference. *Tellabs II*, 551 U.S. at 325-26. With respect to the strength of the inference, I must dismiss the complaint unless "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs II,* 551 U.S. at 324 (2007). Group pleading is not allowed; "the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh v. Tribune Company*, 521 F.3d 686, 693 (7th Cir. 2008).

Section 10(b) of the Exchange Act forbids (1) the "use or employ[ment]... [of] any manipulative or deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" SEC rules and regulations. 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements § 10(b) by declaring it unlawful:

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 CFR § 240.10b-5.

Section 10(b) provides purchasers or sellers of securities injured by its violation with an implied private cause of action. *Tellabs II*, 551 U.S. at 318.

"The securities laws approach matters from an *ex ante* perspective." *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1332 (7th Cir. 1995). Plaintiffs are required to plead facts known to defendants "contemporaneous to the allegedly false statements." *Zerger v. Midway Games, Inc.,* 2009 WL 3380653, at *7 (N.D.Ill. Oct.19, 2009). The plaintiff must thus

allege facts that show with sufficient particularity that the defendants made statements that were false when they were made, as distinct from statements that were incorrect in retrospect. *Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, *20 (N.D.Ill. Mar. 31, 2011).

**B. Count I – Violation of § 10(b) and Rule 10b-5**

I will begin with the allegedly false statements made in connection with new product launches, then address the allegedly false statements made in connection with operational improvements.[2] Last, I will address the scienter requirement.

1. False Statements – New Product Launches

With respect to the new product launches, Plaintiff asserts that the reasons ultimately given by Defendants to explain why the products did not launch on schedule do more than simply explain why the predictions did not come to pass. In Plaintiff's view, these reasons demonstrate that it was clear, even at the time the statements were made, that the predictions *could not* come to pass. And so it follows that the statements were in fact false.

Consider, for example, the WAGE-NET software. In September 2010, Defendants stated that WAGE-NET would be ready for launch in December 2011 (2Q11). Similar statements about WAGE-NET's anticipated launch were made in November 2010. Plaintiff's theory is that: (1) because certain regulatory approval had not yet been obtained and certain field trials had not yet begun at the time the statements regarding WAGE-NET's launch were made; (2) because such approval and such trials were prerequisites for WAGE-NET's launch; and (3) because satisfying such prerequisites would likely take so much time that the announced launch date would be missed, the statements regarding the launch date were necessarily false when made.

---

[2]Plaintiff has also alleged that false statements were made in connection with Defendants' guidance statements, but alleges that the guidance statements were "intertwined with the new product and operational improvement statements" and were false and misleading for the "very same reasons." The analysis in sections B(1) and B(2) below thus applies as well to the allegedly false guidance statements.

7

While I recognize the logic in this train of thought, I cannot find that this explanation states the reason for the statement's falsity with sufficient particularity. At its base, there is still only the summarily stated assertion that, because this regulatory approval had not been obtained when the September 2010 statement was made, the product necessarily could not have been ready for launch a little over a year later, and the statement must therefore have been false. Plaintiff has not explained with particularity why this should be so, and that is insufficient under the heightened pleading requirements prescribed by the PSLRA.

By contrast, consider the reasons given for the alleged falsity of the statements at issue in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006) (*Tellabs I*), and *Silverman v. Motorola, Inc.*, 2008 WL 4360648 (N.D.Ill. Sept. 23, 2008), both cited by Plaintiff.

In *Tellabs*, the plaintiff asserted that optimistic statements made by the defendant corporation regarding customer demand for a particular product were false and misleading. *Tellabs I*, 437 F.3d at 596-97. In pleading the reasons those statements were false when made, the plaintiff asserted: (1) that the defendants knew at the time that their biggest customer had just dramatically reduced orders by roughly 50%; (2) that the defendants were in possession of a market analysis prepared by an outside analyst that they paid for indicating that demand for the product was drying up; and (3) that the corporation's marketing department had distributed an internal memorandum concluding that revenue from the product in question would decline by $400 million. *Id*. at 597.

These allegations demonstrate with particularity why statements made by the defendants like "[i]nterest in and demand for the 6500 continues to grow," and "[t]he demand is very strong," *id*. at 598, could be said to be false. I fail to see any analogous allegations pled in the instant case.

In *Motorola*, the reasons offered for the alleged falsity of the statements in question were similarly stated with more particularity than those offered in the instant case. As in the instant case, the *Motorola* defendants made statements regarding the imminent launch of certain new products that were alleged to be false. *Motorola*, 2008 WL 4360648 at *5. But in contrast with the instant case, the *reasons* offered in support of the falsity of the statements were more particularized. For example, the plaintiffs in *Motorola* asserted that a design defect in the new product, specifically identified and described in detail, was discovered prior to the challenged statements being made, necessarily rendering the defendants' statement false. *Id*. The plaintiffs also described specific software bugs that resulted in a two-month delay in production. *Id*. Again, this too was alleged to have been discovered before the challenged statements were made. *Id*.

The reasons offered for the alleged falsity of the statements at issue here do not measure up and are not stated with similar particularity. For example, Plaintiff asserts:

> [I]t is simply not possible that WAGE-NET was on track for a commercial launch in 2Q11 'en masse' when WMS only received initial regulatory approval from GLI in 4Q11, and field trials in critical jurisdictions like Nevada did not even start until 4Q11 and would take several months to complete.

Perhaps. But the statement assuring that WAGE-NET would be launched in 2Q11 was made 14 months earlier in September 2010. The complaint must allege with particularity *why* the fact that WAGE-NET had not received regulatory approval and had not been through field trials when the statements were made meant that regulatory approval would not be obtained and field trials would not begin until 4Q11. Absent such explanation, pled with particularity, I cannot credit Plaintiff's assertion that the statements simply "must have been" false. *See Pugh*, 521 F.3d at 694-95; *DiLeo*, 901 F.2d at 627.

9

The pleadings with respect to Defendants' January 2011 statements in connection with new games ("tent-pole products") that would be released in the latter half of the year are similarly deficient. I see no reason offered for the falsity of these statements other than what is essentially a contention that, because these statements turned out to be false, they must always have been false. It is clear from the complaint that Defendants made numerous specific statements about the anticipated release of several new products. It is also clear from the complaint that those products were not released as predicted. But the complaint does not explain with sufficient particularity why these statements were false when they were made, as opposed to simply incorrect in retrospect. It is axiomatic that this will not do. I cannot simply take Plaintiff's word for it that the only "plausible" inference to be drawn from these predictions not having come to pass is that they must have been false from the start.

2. False Statements – Operational Improvements

Plaintiff's pleading regarding allegedly false statements in connection with operational improvements fares no better. Take the following statement, made by Defendants in August 2011, for example: "Our product progress, recently implemented actions aimed at improving operating execution and the prioritization of product development, plus prudent capital allocation positions WMS for continued revenue growth and expected margin improvements in fiscal 2012."

Plaintiff asserts that, in earlier statements made during the class period, Defendants represented that efforts at such operational improvements were already underway. Plaintiff points to the subsequent August 2011 statement and others like it in support of his contention that this earlier representation was false when made. Again, I am not persuaded that this pleads the reasons for the statement's falsity with sufficient particularity. Plaintiff editorializes

10

somewhat, and adds the word "only" before the portion of the statement Plaintiff quotes ("WMS had only 'recently implemented actions aimed at improving operation execution…'"). But that is not what was said, and it is certainly not how the statement must be read or understood.

There is nothing in the complaint that demonstrates with particularity why Defendants' statements regarding operational improvements were false when made. Mere puffery cited by Plaintiff such as Defendants touting their "intense focus" and "vigilance" in executing the operational improvements will not suffice. That the operational improvements were not implemented despite these statements does not render the statements actionably false; and it certainly does not state the reason for their falsity with particularity.

3. Scienter

The deficiency in Plaintiff's efforts to plead scienter is closely related. Once again, I am urged to accept that it is essentially self-evident that, given the circumstances under which the challenged statements were made (for example, the fact that regulatory approval for certain products had not yet been obtained), the statements must have been false. In pleading scienter, Plaintiff builds on that contention and urges another assumption. The Individual Defendants, by virtue of their respective positions in the company, must have been aware of those circumstances, and must have drawn the same conclusion from them. So not only was the writing on the wall, Plaintiff contends, but Defendants must have seen it, and they therefore must have known (or recklessly disregarded) that their statements were false.

This scienter pleading, while again logical, similarly is not stated with sufficient particularity. As in *Tellabs*, it is perfectly acceptable to ask the Court to make inferences as to the sort of company-related information a defendant holding a given position is very likely to have. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) ("*Tellabs*

11

*III*"). But in *Tellabs*, this information was detailed and specific, and its implications for the falsity of the statements at issue were clear and stated with particularity. As noted above, the plaintiff in *Tellabs* asserted that the defendant corporation's largest customer had reduced orders by 50%, that a market analysis commissioned by the defendants concluded that demand for the product at issue was drying up, and that the company's marketing department had distributed an internal memorandum concluding that revenue generated from the product would decline by $400 million. *Tellabs I*, 437 F.3d at 597.

These were clear and specific facts from which the plaintiff could argue that the defendants' statement that demand for the product in question "continues to grow," and others like it, were false. *Tellabs III*, 513 F.3d at 709. And they were clear and specific facts with which the defendants, the plaintiff could argue, must have been familiar, given the positions they held with the company. *Id*. at 711.

Here, it may well be correct to infer that the Individual Defendants had the knowledge with which they are charged by Plaintiff. But it is hardly a given that the next step in Plaintiff's theory necessarily follows from the first. Plaintiff has come to his own conclusions as to what inferences must be drawn from facts such as the unobtained regulatory approval, the lack of field trials, the new products that did not launch, and the operational improvements that were not implemented. Defendants may not have come to the same conclusions at the time the statements in question were made. And without more particularized facts as to why Defendants could not have come to alternative conclusions in good faith, I cannot properly weigh the strength of the scienter inference urged by Plaintiff against that of other opposing, non-culpable inferences. *See Tellabs II*, 551 U.S. at 324. That is the burden imparted by the heightened pleading standard of the PSLRA, and it has not been met here.

B. **Count II – Violation of § 20(a)**

Finally, as Defendants note, to state a claim under § 20(a) of the Exchange Act, Plaintiff "must first adequately plead a primary violation of the securities laws – here, a violation of § 10(b) and Rule 10b-5." *Pugh*, 521 F.3d at 693. Plaintiff's failure to do so requires dismissal of Count II as well.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted, this time with prejudice.

ENTER:

James B. Zagel
United States District Judge

DATE: April 24, 2013